Our fourth case for argument today is United States v. Courtright. Mr. Shabani. Good morning. May it please the Court. My name is Matthew Shabani and I represent the appellant, Mr. Courtright. I would ask to reserve the last two minutes of my time for rebuttal if I have it to reserve. That the District Court erred in several respects in denying Mr. Courtright's Rule 29 motion and erred in several respects in calculating the loss amount is evident and we consider the evidentiary record as a whole. It's important in this regard to go back all the way to the indictment of June of 2020. Notably, the government charged that Mr. Courtright ran a Ponzi scheme. Interestingly, as the case proceeded, the government changed its position, so much so that the government eventually agreed not to use the word Ponzi scheme at trial. Now, if we fast forward to the sentencing hearing, the District Court's own statements are even more telling. The District Court said during the sentencing hearing, I don't really think that Mr. Courtright set out at the beginning of this to cheat and defraud people. I really don't. The District Court, although noting in its opinion that TGC was doomed from the outset, the District Court said it was not prepared to say that Mr. Courtright went into this scheming and plotting. Rather, as the District Court posited, Mr. Courtright had somewhat delusional good intentions. Can you explain how this helped you when the government did not charge the scheme beginning from the time when the company was started, but from 2015? This line of argument that you're going on. Yes, Judge. We're not saying that the government charged it in that way, but the evolution of the government's movement, and then the culminating statements by the District Court, bear directly on whether there was a scheme, and Mr. Courtright's purported intent to defraud. In other words, the District Court's opining on what Mr. Courtright's intent, or what his belief, or whatever, was when he started the company would seem to be, to me, not the question about his intent, or etc., etc., starting at the time the scheme was charged in 2015. Understood, Judge. Again, here, the evidentiary record does not provide additional support sufficient to support a conviction that at some point after it was originally charged, after that point in 2015, that Mr. Courtright developed such a scheme. In fact, the record makes a number of things clear. One is his consistent efforts towards transparency, and we can look just at the functioning, the operation of his company alone. So this was, in every respect, a legitimate brick-and-mortar company that eventually grew to employ well over 100 people that operated from teams on two different countries, Lancaster, Pennsylvania in the U.S., and Bucharest, Romania. So this was no facade. These were not ghost payrollers. These were real people doing real work to maintain a portfolio of websites. And that concept of the portfolio of websites and the underlying operational strategy of interconnecting them in order to maximize and leverage their ad revenue ability, that was key. And this was not Mr. Courtright's untested pipe dreams. And so how did that change after Mark Zuckerberg's testimony? So that brings up another important point. There were external factors outside the control of Mr. Courtright that presented challenges that were unforeseen by anyone. Mr. Zuckerberg's testimony impacted that industry as a whole, certainly not just Mr. Courtright's company. And Mr. Courtright's response to that, when we look at his actions following 2017, further support that this was not an individual attempting, that had an intent to defraud or scheme. In fact, he worked doggedly to bring on a number of the industry's top performers and leaders, Stephen Spencer, Patrick Tan, David Corbin, David Olson, and interestingly, and I think very importantly, Jared Wasserman, a certified fraud examiner. Someone who is developing an attempt to defraud after this starts would not show the books to a certified fraud examiner. So I think Mr. Courtright's actions, as they bear out in the record, support that as well. So in response to Mr. Zuckerberg's testimony, TGC, today's growth consultant, took a major hit that took a long time to recover from. And that led to ultimately the actions in 2019, which included in part the hiring of David Kelly, who had 20 years experience as the Chief Technological Officer for Merrill Lynch, to develop, really build on Mr. Courtright's already demonstrated track record of success, but he needed to leverage it. And this was the hub and spoke strategy. In this strategy, Mr. Courtright, David Kelly, and the team of leaders at TGC all believed that this would return. Mr. Javari, you only have a few minutes left before your rebuttal time begins. Actually, less than. You have 42 seconds. So let me ask you this. You know, you're not altogether wrong to suggest, Mr. Courtright, that legitimate funds may have been spent on operating this company, maintaining payroll and staff and et cetera, et cetera, et cetera, maintenance, site maintenance. But there was also evidence at trial about a lot of commingling, absolute commingling of funds. And so, and I didn't see where Mr. Courtright presents a workable solution for the district court to kind of disaggregate funds and figure out what would have been legitimate infrastructure costs, you know, for this scheme period versus not. So where is the clear error in the court not deducting these, what is it, 34 million in infrastructure costs? And you're into your rebuttal time. Briefly, Your Honor, the record makes clear that these expenses exist regardless of the logistical setup of the accounts. There were a team, again, well over 100 employees. The need to maintain the websites, all the infrastructure costs, that was clear. Whether how the accounts were disaggregated I think detracts from, that doesn't speak to the legitimacy of these expenses and that they were legitimate expenses unlike the district court use of the inept analogy of liking this to a bank robbery which is never anything but illicit from the beginning. This company was legitimate. These expenses were legitimate and properly incurred and the record made clear that those existed and argument is that those should have been additionally deducted when calculating the loss amount. And I'll reserve the remainder of my time unless there's other questions. You haven't said anything about the loss calculation. Do you plan to address that? Yes, if I may do so briefly, Judge. Again, the loss amount really fails to incorporate these additional legitimate expenses that run to the tune of tens of millions. Had that been accurately factored into the loss amount, that would have also indicated the level enhancement that was ultimately determined to be a 22 level. If that were accurately calculated, that would significantly drop the level potentially. So where particularly is the clearly erroneous finding? We're not going to make an independent decision. You must be arguing that the district court's finding is clearly erroneous. Your brief actually violates Circuit Rule 30 because it doesn't even give us the district court's finding. The district court found in calculating the amount to be $52.5 million, it did not deduct the additional expenses as we argued in preparation for sentencing. The error in the district court's error lies in failing to account for those additional expenses in calculating the ultimate loss amount. That loss amount, in turn, was used to calculate the guideline range and impacts the ultimate sentence. Thank you, counsel. Thank you. Good morning, Your Honor. May it please the court. My name is Adam Rosenblum, and I represent the United States. I want to start by addressing a point that Mr. Chivari made, that the government's theory about whether this was a Ponzi scheme has evolved, and it has not. At no point during the litigation in district court or in this court has the government backed away from the theory that the defendant operated a Ponzi scheme from 2015 to 2019. The government agreed in district court not to affirmatively describe the company as a Ponzi scheme to the jury during the trial, but that was the limit to the government's concession in that regard. This court should affirm the judgment and the sentence of the district court because the evidence was more than sufficient to support the jury's verdict. The evidence in the form of... Because we're here on a Rule 29 motion, why don't we walk through that? Just lay it out for us as what that evidence was. So the evidence, the defendant's brief makes, as I understand it, three arguments as to the sufficiency of the evidence. That the evidence wasn't material, that the statements weren't material, that statements as to the financial health of the company, we didn't prove that they were false, and that the defendant didn't act with intent. The categories of misstatements that the government charged were that there were misrepresentations as to how investor funds would be used, that they'd be used solely for the benefit of that specific investor, that guaranteed monthly payments paid out to earlier investors, the source of those funds were websites operated by the company for its own benefit or the benefit of other site partners, and that the financial health of the company was strong. The victims who testified in trial, they testified uniformly that those statements, those issues were important to their decision to invest with the company. What do we do, though, with the counter to that is that the Consulting Performance Agreement put these investors on notice that, well, the money was also going to be used, right? Your investment money was going to be used to pay out to those who came, you know, to help make those payouts, basically getting your money back. Well, it didn't do that, Your Honor. I don't think that's a fair reading of the Consulting Performance Agreement. I think you're alluding to the draw provision. I am. All the draw provision says, and this is from Government's Exhibit 1, but it's substantially identical across the Consulting Performance Agreements, today's growth consultant will begin paying an irrevocable, non-recoverable draw against earnings. The draw will be set at 20% of the upfront fee per month and continue into perpetuity. I don't read anything in that statement to say you'll be getting your own money back. I don't think that's a fair reading. I don't think you could get your own money, 20% of your own money back per year into perpetuity. The math doesn't work, and the defendant admitted that on cross-examination when he testified. And the record shows that when victims in the course of the scheme asked, are you paying me back with my own money, the answer wasn't yes. The company, neither the defendant nor anyone else at the company ever said yes, of course you're being paid back with your own money, just like we promised you in your Consulting Performance Agreement. So this draw argument is a post hoc rationalization that is not an accurate portrayal of what was in the agreement. The agreement's promised we will use your money for your benefit only, for your websites only, and that's not what they did. Even putting aside using the money for general operating expenses, whether or not that was permissible, what is clearly not permissible under the agreement is using the money to pay earlier investors. That's not what any victim expected. That's not what the contract says. And that's not what the victims who are receiving money from the company were told either. They were not told, you're receiving money from earlier investors. And the reliance on that new investor money to make those payments, that shows or gives the jury a basis to say that the company's not in good financial health. So all of the categories of misrepresentations, there was evidence in the record to show that they were false, that they were material, and the defendant knew they were material. He received every month a spreadsheet showing how every website was doing. He had conversations with the financial people at the company to know the websites weren't performing and that the company was using investor funds in this way, and he repeatedly lied to current investors, to new investors. So he knew that these statements were false, and that gave the jury a basis to find that he acted with the intent to defraud. So for all those reasons, the evidence was sufficient to support the jury's verdict. The court should also affirm the sentence of the district court. The primary argument, I think, in the brief at least, was that the district court failed to perform a causation analysis, a foreseeability and a but-for cause analysis. Can we do the loss calculation first? Yes, Your Honor. So I think the district court did not clearly err in determining that these operating expenses should not be deducted from the loss amount. The district court's analogy that these were akin to bank robbery tools, these were, as I think, accurate because the operation of the company, the outward appearance of the company, having offices, having employees. Just because we're reviewing for clear error, I know we started at $69.3 million, and so can you walk us through why $52.5 million was not clearly an error on behalf of the court, of the district court? Just how did the math? Sure. So we started at $69 million and change based on claims that were received in the SEC case from victims that the receiver in that case approved. From that number, the district court subtracted funds that had already been paid back to victims. To the victims? To the victims, which the government objected to and I think is not supported by the commentary to the guidelines, but the district court did so nonetheless. And the district court made a deduction also for certain investors who, in lieu of receiving their money back, received their websites back and made a certain deduction for that. And then that's where the district court stops, if I'm remembering the record correctly. The defendant argued that in addition to those amounts, there should be a deduction for the purported value of some websites that were not sold for what the defendant viewed as their full value. That's no longer alive on appeal and the district court denied that deduction. The deduction that is the subject of the appeal is the operating expenses deduction, wages and infrastructure costs. There was not clear error to exclude those as a deduction from the loss amount because those funds were used to perpetuate the scheme. The keeping up the appearances of the company, it was a part of the scheme. It was akin to the tools for a bank robbery because the defendant could not have continued to perpetuate his fraudulent scheme without having this company appear the way that it did. Now that you've gone over the numbers, can we back up? The district court did not address causation. Shouldn't it have? The district court didn't use the words foreseeability but for cause. It didn't explicitly address causation, but I don't think it's fair to read the district court's adoption of the defendant's argument that $69.3 million was the right place to start without implicitly acknowledging that that number does include causation, that does address a causation analysis. Perhaps the district court should have used those magic words, foreseeability but for cause. It didn't, but I think that there's no way to say that the district court didn't think about those factors when it looked at claims coming in, claims that were approved, and in addition issued a restitution order for $68 million, so the total amount of loss before the funds paid back, which is not being appealed, but the fact that the district court came to both those conclusions I think shows that it could not have come to the conclusion it did without considering causation. And so briefly, Your Honor, in my last minute, the government's position remains that the defendant waived this foreseeability argument, though regardless of the standard the court applies, the court should affirm the sentence of the district court. So if there are no further questions, the government requests that the court affirm the judgment and sentence of the district court. Thank you. Thank you, counsel. Mr. Shabari, I'll give you one minute for a rebuttal. Your Honor, as far as the – this court made clear in Burns that without the words reasonable foreseeability or proximate cause or their variance appearing in the transcript, that that results in procedural error. To say that addressing an amount infers or implies causation is, again, a post hoc attempt to insert a causation analysis where one does not exist. This court made very clear in Burns that those words or their variance need to appear in order to demonstrate that that causation determination took place. Here in the sentencing transcript, the words reasonable foreseeability, proximate cause, or their variance. Thank you, counsel. Thank you. Mr. Shabari, the court appreciates your willingness to accept the appointment in this case. Thank you. The case is taken under advisement.